## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

ROBERT COLAJEZZI and )
LYDIA COLAJEZZI, )
                              )
      Plaintiffs, )
                              )
v. )      Civil Action No. _____
                              )
UNITED STATES OF AMERICA, )
                              )
      Defendant. )

## COMPLAINT

Robert Colajezzi ("Mr. Colajezzi") and Lydia Colajezzi ("Mrs. Colajezzi") (collectively, "Plaintiffs"), by counsel, state as follows for their Complaint against Defendant United States of America:

### Jurisdiction and Venue

1.    This action arises under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq*. This Court is vested with jurisdiction to adjudicate this dispute pursuant to 28 U.S.C. § 1346(b).

2.    In compliance with 28 U.S.C. § 2675, Mr. Colajezzi filed a notice of administrative claim with the Department of Veterans Affairs, attached hereto as Exhibit A. That claim was received by the Department of Veteran Affairs on October 26, 2015.

3.      In compliance with 28 U.S.C. § 2675, Mrs. Colajezzi filed a notice of administrative claim with the Department of Veterans Affairs, attached hereto as Exhibit B.  That claim was received by the Department of Veteran Affairs on October 26, 2015.

4.      The Department of Veterans Affairs denied Mr. Colajezzi's claim on March 15, 2016.

5.      On March 25, 2016, Mr. Colajezzi requested reconsideration of the Department of Veterans Affairs' denial.

6.      To date, no determination has been made as to Mr. Colajezzi's request for reconsideration.  Accordingly, Mr. Colajezzi's claim is ripe to be litigated in this Court pursuant to 28 U.S.C. § 2675(a).

7.      To date, no determination has been made as to Mrs. Colajezzi's notice of administrative claim.  Accordingly, Mrs. Colajezzi's claim is ripe to be litigated in this Court pursuant to 28 U.S.C. § 2675(a).

8.      Plaintiffs hereby certify that they are fully compliant with Pa. R. Civ. P. 1042.3.  Plaintiffs' certificate of merit is attached hereto as Exhibit C.

9.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1402(b) because the cause of action arose within the Eastern District of Pennsylvania at the Philadelphia VA Medical Center ("Philadelphia VAMC") in Philadelphia, Pennsylvania.

10.     At all times relevant to this action, the United States owned and operated the Philadelphia VAMC and its affiliated outpatient care centers.

11.     At all times relevant to this action, the agents, servants, employees, and personnel of the United States were acting within the course and scope of their employment in providing and/or failing to provide medical care and treatment to Mr. Colajezzi.

12.     At all times relevant hereto, Plaintiffs resided at 6628 Gillespie Street, Philadelphia, Pennsylvania 19135.

13.     Mr. Colajezzi was a veteran of the United States Army, and thus he was entitled to care and treatment at the Philadelphia VAMC and its affiliated outpatient care centers.

14.     The medical care described as follows was provided to Mr. Colajezzi at the Philadelphia VAMC and/or its affiliated clinics unless otherwise stated.

## Allegations

15.     Plaintiffs restate and re-allege paragraphs 1 through 14 as if fully stated herein.

16.     On September 10, 2012, Mr. Colajezzi presented to Pennsylvania Foot and Ankle with complaints of a painful bunion.   David Wander, DPM ("Dr. Wander") evaluated Mr. Colajezzi and noted that Mr. Colajezzi was suffering from

aching, sore, and throbbing pain in his right first metacarpophalangeal joint (MPJ), more commonly known as the big toe joint.

17.     Dr. Wander performed an examination and documented a bunion on Mr. Colajezzi's first MPJ, limited movement, pain when walking, a painful palpable bump, swelling, and irritation.

18.     Accordingly, Dr. Wander diagnosed Mr. Colajezzi with a hallux valgus deformity (a bunion).

19.     Due to the severity of Mr. Colajezzi's deformity, bunion surgery was discussed as a potential solution.  However, Mr. Colajezzi opted to utilize non-invasive interventions before proceeding with surgery.

20.     On September 9, 2013, nearly a year after his evaluation with Dr. Wander, Mr. Colajezzi presented to the Philadelphia VAMC to discuss surgical solutions for the painful bunion.  Karen Galli, DPM ("Dr. Galli") and Jeffrey Rosenman, DPM ("Dr. Rosenman"), a podiatry resident acting under the supervision of Dr. Galli, evaluated Mr. Colajezzi and ordered x-rays of his right foot.

21.     The examination revealed a HAV deformity (bunion) on Mr. Colajezzi's right foot, as well as hammertoes in his right second and third toes, as well as adducto varus deformity (rotation away from the big toe) in his right fourth and fifth toes.

4

22.     The x-ray, interpreted by Esther M. Kim, MD ("Dr. Kim"), revealed "moderate to severe hallux valgus deformity" (bunion) and a "posterior calcaneal spur" (bone spur).   Importantly, Drs. Galli and Rosenman noted that the x-rays were of poor quality and that at Mr. Colajezzi's "PreBed" appointment new x-rays would need to be performed.

23.     Despite the poor quality of the x-rays, Drs. Galli and Rosenman nonetheless planned surgery, to be performed on January 8, 2014, as follows:

> Current impression for surgical plan would be Scarf [describing the shape of the bone cut] versus Kalish with screws, #2 Metatarsophalangeal (MTP) joint release with #2 Proximal Interphalangeal Joint (PIPJ) arthroplasty with Pin Fixation, #4 PIPJ arthroplasty and #5 derotational PIPJ arthroplasty. **This plan may change depending on normal right foot X-ray finding on day of PreBed.**

24.     On November 12, 2013, Mr. Colajezzi was evaluated by Patricia Zarnitz, CRNP ("Ms. Zarnitz") with regard to his bunion.  Ms. Zarnitz examined Mr. Colajezzi and, at his request, ordered foot x-rays.

25.     The x-rays ordered by Ms. Zarnitz, however, were never performed.

26.     On December 19, 2013, Dr. Galli, along with Maikel Graiges, DPM ("Dr. Graiges"), a podiatry resident acting under the supervision of Dr. Galli, evaluated Mr. Colajezzi.  This December 19 visit was Mr. Colajezzi's "PreBed" visit.

27.    Drs. Galli and Graiges performed a cursory physical examination and recorded the following assessment and plan:

> HAV, Hammertoes – Scheduled for Right scarf, arthroplasty 2 with MPJ release, 4 and 5th derotational arthroplasty on 1/8/14.  Surgical intervention thoroughly discussed with patient including risks, outcomes, and post-op course.
> -consent signed and uploaded to CPRS
> -Patient to complete pre-bed procedures today
> -SPU will contact patient the day before surgery with arrival time
> -1st post-op appointment on 1/16/14.

28.    Drs. Galli and Graiges, however, failed to order new x-rays.

29.    Thereafter, Mr. Colajezzi met with Steven Garfinkle, DO ("Dr. Garfinkle") for an "Impact Assessment."   Dr. Garfinkle determined that Mr. Colajezzi was an intermediate risk for surgery, but was an "acceptable candidate for purposed elective RIGHT foot surgery, 1/8/14."  Dr. Garfinkle also did not order new x-rays nor did he recommend new x-rays be performed prior to Mr. Colajezzi's January 8 procedure.

30.    On December 23, 2013, Craig Gross, MD ("Dr. Gross") performed an anesthesia pre-operative review.  Dr. Gross determined that Mr. Colajezzi was a "suitable candidate for proposed surgery/anesthesia without further work-up." Dr. Gross did not order, nor did he recommend, new imaging studies be performed prior to the January 8, 2014 procedure.

6

31.    On January 8, 2014, Mr. Colajezzi presented to the Philadelphia VAMC for the "right scarf, arthroplasty 2 with MPJ release, 4 and 5th derotational arthroplasty."

32.    Susan Gamble, DPM ("Dr. Gamble"), in a pre-operative note, documented Mr. Colajezzi's bunion and hammertoe deformities and further reviewed "clinical information and surgical plan."    Moreover, Dr. Gamble documented that she had "examined the patient and reviewed the current History and Physical."   Nevertheless, Dr. Gamble did not order or recommend additional imaging studies be performed prior to Mr. Colajezzi's surgery.

33.    Dr. Gamble, assisted by Drs. Rosenman, Griages, and Shruti Kommareddy, DPM ("Dr. Kommareddy"), performed Mr. Colajezzi's scarf bunionectomy and right foot arthroplasty.   Dr. Gamble noted that "[o]ne 16 mm cannulated headless and one 18 mm cannulated headless 3-0 screws were placed across the osteotomy site proximally and distally respectively."

34.    The procedure actually performed is one typically reserved for elderly patients and results in the loss of the big toe joint.   There was, however, no indication either pre- or intraoperatively that would suggest the need to perform this type of operation on Mr. Colajezzi.   Dr. Rosenman, Dr. Griages, Dr. Kommareddy, and Dr. Gamble failed to order, or recommend, intra-operative

imaging studies to ensure correct positioning of the screws and proper reduction of the deformity.

35.     Following the procedure, Dr. Gamble did order x-rays.  These post-operative x-rays were interpreted by Hazel D. Rovno, MD ("Dr. Rovno") and demonstrated poor placement of the screws used for stabilization.  Dr. Rovno noted two screws traversing a fracture site but that it was "difficult to confirm the extent to which the [ ] screws penetrate[d] to the more plantar fragment, and on the views presented it [was] very difficult to tell whether these screws in fact [would be] able to maintain fragment placement."  Indeed, these x-rays demonstrated the likely existence of an unstable osteotomy.

36.     Dr. Rovno further expressed "[c]oncern regarding screw placement" and recommended immediate follow-up, either with a CT or with additional x-rays and recorded a primary diagnostic code of "major abnormality."

37.     Dr. Rovno's recommendations were apparently ignored.  Neither Dr. Galli nor Dr. Gamble ordered follow-up x-rays or a CT scan as had been recommended by Dr. Rovno.  Rather, in a post-operative report, Drs. Kommareddy and Gamble noted Mr. Colajezzi's disposition as "stable" and discharged him home despite the fact that the x-rays clearly show the screws used for fixation of the first metatarsal osteotomy were inappropriately placed and failed to engage the plantar cortex of the first metatarsal, resulting in instability.

38.     Thereafter, on January 16, 2014, Mr. Colajezzi presented to the Philadelphia VAMC for his first post-operative follow-up appointment. Drs. Kommareddy and Galli evaluated Mr. Colajezzi, noting "complaints of mild numbness in digits distally." Further, Drs. Kommareddy and Galli documented "[m]ild to moderate edema noted to dorsal foot and digits" and that, although the bandages on Mr. Colajezzi's foot were intact, there was a "moderate amount of serosanguinous drainage noted to insides of bandages."

39.     Despite the drainage, swelling, and complaints of numbness, Drs. Kommareddy and Galli sent Mr. Colajezzi home again as "stable, no Signs Of Infection (SOI)." Mr. Colajezzi was instructed to continue partial weight bearing as needed and to return to the clinic in one week for follow-up. No imaging studies were ordered to evaluate the osteotomy for stability or the adequacy of the correction and fixation at this January 16, 2014 visit.

40.     On January 23, 2014, Mr. Colajezzi returned for his second post-operative follow-up appointment. Updated x-rays of Mr. Colajezzi's right foot were performed and interpreted by David B. Freiman, MD ("Dr. Freiman"). Dr. Freiman found continued "rotation of the distal fragment with the distal fragment extending to within 1 or 2 mm of the second metatarsal." These x-rays again demonstrated an unstable osteotomy, inadequate fixation, and related rotation of the first metatarsal likely caused by the inadequacy of fixation.

41.   Following the x-rays, Mr. Colajezzi was evaluated by Anne Sonoga, DPM ("Dr. Sonoga").   At this visit, Dr. Sonoga noted continued mild to moderate forefoot swelling and mild irritation at Mr. Colajezzi's surgical incisions.   No clinical examination, however, was performed to assess the stability of the osteotomy.

42.   Nevertheless, in spite of the continued swelling and concerning imaging studies, at this January 23 visit Dr. Sonoga determined that Mr. Colajezzi was stable and transitioned him from a splint to a controlled ankle movement (CAM) walker.   Dr. Sonoga instructed Mr. Colajezzi to return in two weeks.   Dr. Sonoga, however, failed to address the continued inadequacy of screw fixation from the surgery, the failure of the deformity to improve, and the osteotomy instability.

43.   On February 6, 2014, Mr. Colajezzi had new x-rays performed prior to a follow-up visit with Dr. Galli.   These imaging studies were interpreted by Dr. Freiman as showing "no interval change" in comparison with the first preoperative x-ray performed on January 8, 2014.

44.   Mr. Colajezzi presented to Dr. Galli on the February 6 visit wearing the CAM walker and using crutches for ambulation.   At this point, Mr. Colajezzi was nearly four weeks post-operative but was continuing to experience pain and numbness.   Dr. Galli advised Mr. Colajezzi to discontinue use of crutches but to

continue utilizing the CAM boot when walking.  Mr. Colajezzi was instructed to return for a follow-up appointment in two weeks.  Significantly, Dr. Galli noted that the x-rays "demonstrate[d] healing of longitudinal and proximal arm of the osteotomies."  However, Dr. Galli failed to assess or address the inadequacy of the fixation, loss of correction of the osteotomy, or the instability of the osteotomy.

45.   On February 24, 2014, Mr. Colajezzi again presented to the Philadelphia VAMC.  Additional imaging studies were performed at this visit and interpreted by Dr. Kim.  Dr. Kim noted "post-surgical defect of the PIP joint of the fifth toe" and stated that "the PIP joint space appear[ed] increased in the interval since the prior study."

46.   At the February 24 visit, Mr. Colajezzi was again seen and evaluated by Dr. Galli.  Mr. Colajezzi expressed complaints of pain, swelling, and numbness in his right foot and stated that he was unable to drive or return to work due to these complaints.  Dr. Galli simply provided Mr. Colajezzi with compression socks, but offered no further interventions.  Dr. Galli scheduled Mr. Colajezzi for another follow-up appointment on March 18, 2014.  Again, Dr. Galli failed to assess or address the first metatarsal instability, the inadequacy of fixation, or the instability of the osteotomy.

47.   Mr. Colajezzi presented to the Philadelphia VAMC podiatry clinic on March 18, 2014 and was evaluated by Dr. Gamble.  Curiously, Dr. Gamble noted

that the most recent x-rays demonstrated "good alignment with fixation in place."
Dr. Gamble also documented continued edema in Mr. Colajezzi's right foot with
"some lateral drifting of hallux" apparent on physical examination.

48.     As of the March 18 visit, it had been over two months since Mr.
Colajezzi underwent the scarf bunionectomy.  However, in spite of Mr. Colajezzi's
continued complaints of pain and swelling and in spite of continued concerning x-
ray findings, Dr. Gamble determined that Mr. Colajezzi was "[o]verall doing well"
and instructed him to return to the clinic in three months.  Further, Dr. Gamble
provided Mr. Colajezzi with a note documenting his apparent ability to return to
work on April 1, 2014.  In fact, despite Dr. Gamble's notes to the contrary, the
post-operative x-rays demonstrated inadequate fixation with the failure of the
screws to engage the plantar cortex of the first metatarsal, an unstable osteotomy
with loss of correction, recurrent hallux valgus, and recurrence of the
intermetatarsal angle deformity.

49.     On May 5, 2014, Mr. Colajezzi returned to the Philadelphia VAMC
podiatry clinic complaining of pain 7/10, numbness on the dorsal aspect of his
right foot, and continued swelling after ambulation.  Dr. Gamble ordered x-rays,
which were interpreted by Dr. Kim.

50.     Dr. Kim determined that the screws were "in place with heterotopic
ossification first metatarsal bone" (bone callus formation from the osteotomy

instability) and "subluxation 1st MTP joint" (dislocation).   Additionally, Dr. Kim noted "post-surgical defects," that "the second MTP joint appears widened," and "there is spurring calcaneus."   These x-rays also showed recurrence of the hallux valgus deformity.

51.   That day (May 5), after months of continued complaints, Dr. Gamble ordered physical therapy for Mr. Colajezzi, an ankle sleeve for his right foot, and advised him to continue utilizing compression socks.   Dr. Gamble did not assess for stability of the first metatarsal osteotomy.   Dr. Gamble likewise failed to address the loss of correction, inadequate fixation placement, and the unstable osteotomy.

52.   On June 16, 2014, Drs. Galli and Rosenman evaluated Mr. Colajezzi at the Philadelphia VAMC podiatry clinic.   Mr. Colajezzi was now six months post-operative but had continued complaints of pain and swelling.   At this visit, Dr. Galli informed Mr. Colajezzi for the first time that there were complications present.   Strangely, Dr. Galli also told Mr. Colajezzi "that there was no work specifically performed on the head of the metatarsal or the base of the proximal phalanx and that he may have a compressed joint as well as periarticular arthritis," despite the fact that the operative note and the post-operative x-rays clearly indicate that the base of the proximal phalanx was resected in a manner similar to the Keller bunionectomy.   The reason for this misrepresentation is unclear.   Dr.

Galli further advised Mr. Colajezzi that he may require additional surgical procedures to gain more range of motion. In the meantime, however, Dr. Galli ordered inserts for Mr. Colajezzi to wear in his work shoes to assist in pain alleviation.

53.     Dr. Galli   did not order or recommend imaging studies at this June 16, 2014 visit.

54.     Shortly after the June 16 visit, Mr. Colajezzi sought a second opinion with regard to his continued and disabling foot pain and swelling. Dr. Wander saw and evaluated Mr. Colajezzi on July 7, 2014. Dr. Wander noted that Mr. Colajezzi had previously presented with a painful bunion on his right foot, that he had undergone surgical correction at the VA in January, but that he continued to suffer pain, discomfort, swelling, and joint stiffness.

55.     Based on Mr. Colajezzi's complaints, both a physical exam and imaging studies were performed. Dr. Wander's physical evaluation revealed the following:

> Bunion right 1st MPJ, limited dorsiflexion, limited plantarflexion, pain when walking, painful, palpable medial bump, swelling, erythema, hypermobile first ray, pain with range of motion with greatly limited range of motion.

56.     Further, the x-rays performed on July 7, 2014 revealed:

> Evidence of a midshaft osteotomy with screw fixation still intact. There is minimal correction of the IM angle with continued abundant bone callus **and at least one screw appears to have missed the**

**osteotomy**.    There is a large HA angle with evidence of a Keller/surgical removal of the base of the proximal phalanx.  There is also evidence of some elevatus.

57.    Simply put, Dr. Wander's clinical and radiographic evaluations noted that the screws utilized for the fixation of the osteotomy failed to engage the plantar cortex of the osteotomy, that there was a large intermetatarsal angle present that was the very deformity for which the osteotomy had been performed, that there was a recurrence of the hallux valgus, and that the base of the proximal phalanx had been resected—a surgical procedure which Dr. Galli denied having performed.  All of these complications were demonstrated in post-operative x-rays taken and reviewed at the Philadelphia VAMC but were never identified, diagnosed, or treated by the medical providers there.

58.    As a result, Mr. Colajezzi now suffers from a recurrent deformity with worsened angulation which will require revision surgery to correct.  He likewise suffers from chronic and persistent pain, swelling, and difficulty walking.

59.    Mr. Colajezzi was forced to take medical retirement as he was unable to perform his job as a correctional officer.

60.    Mr. Colajezzi's injuries are a direct result of the negligent care provided by Mr. Colajezzi's healthcare providers at the Philadelphia VAMC.

## Negligence

61.   Plaintiffs restate and reallege paragraphs 1 through 60 as if fully stated herein.

62.   As a provider of medical services to Mr. Colajezzi, the United States and its agents, servants, or employees at the Philadelphia VAMC and its affiliates, including but not limited to Drs. Galli, Rosenman, Kim, Graiges, Garfinkle, Gross, Gamble, Kommareddy, Rovno, Freiman, and Sonoga, as well as Ms. Zarnitz, owed Mr. Colajezzi a duty to provide him medical care consistent with the governing standard of medical care.

63.   The agents, servants, or employees of the United States at the Philadelphia VAMC and its affiliates, including but not limited to Drs. Galli, Rosenman, Kim, Graiges, Garfinkle, Gross, Gamble, Kommareddy, Rovno, Freiman, and Sonoga, as well as Ms. Zarnitz, while acting within the scope of their employment, violated the applicable standards of medical care in the following respects:

     a.   Negligent failure to order and perform pre-operative x-rays;

     b.   Negligent performance of the January 8, 2014 surgery and lack of indication for same;

     c.   Negligent failure to order and perform intra-operative and post-operative x-rays;

      d.     Negligent failure to timely diagnose and provide appropriate treatment for complications arising from the January 8, 2014 surgery; and

      e.     Negligent failure to appropriately interpret and report imaging studies performed on Mr. Colajezzi's right foot.

64.   As a direct and proximate result of the aforementioned negligence of Defendant, Plaintiffs claim the following damages:

      a.     Compensation for pain, suffering, disfigurement, disability, mental anguish, emotional distress, and loss of life's pleasures;

      b.     Compensation for all economic damages, including medical bills and expenses, incidental expenses, loss of earnings, and loss of earning capacity;

      c.     Compensation for loss of consortium, companionship, and services; and

      d.     Compensation for any other damages sustained by Plaintiffs as a proximate result of the negligence of the government's employees and/or agents.

WHEREFORE, Plaintiffs request that the Court grant judgment in their favor against the Defendant in the amount of Six Million Dollars ($6,000,000.00), together with any other costs as they may be lawfully entitled to recover.

Dated this _10th_ day of January, 2017.

<div style="margin-left: 45%;">

Respectfully submitted,

ROBERT COLAJEZZI and
LYDIA COLAJEZZI

By: _____
Richard L. Frankel
Bross & Frankel, P.A.
102 Browning Lane, Bldg. C-1
Cherry Hill, NJ 08003
(856) 795-8880
(856) 795-1242 – Facsimile
rich@brossfrankel.com
Counsel for Plaintiffs

</div>